(C. D. 1126)

ENRIQUE C. LINEIRO *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 18, 1948)

*Lawrence, Tuttle & Harper* (*Walter I. Carpeneti* and *Chas. J. Evans* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard H. Welsh,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: These are protests arising at the port of Nogales against the collector's assessment of duty on merchandise invoiced as milo maize at the rate of 2 cents per pound under paragraph 763 of the Tariff Act of 1930, as "grass and forage crop seeds not specially provided for." It is claimed that the merchandise is entitled to free entry under paragraph 1722 as a crude vegetable substance, or is dutiable at 10 per centum ad valorem under paragraph 1558 as a nonenumerated unmanufactured article.

The pertinent provisions of the tariff act are as follows:

PAR. 763. Grass seeds and other forage crop seeds: * * * all other grass and forage crop seeds not specially provided for, 2 cents per pound: * * *.

PAR. 764. Other garden and field seeds: * * * *Provided,* That the provisions for seeds in this schedule shall include such seeds whether used for planting or for other purposes.

PAR. 1722. Moss, seaweeds, and vegetable substances, crude or unmanufactured, not specially provided for. [Free.]

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, * * *.

At the trial plaintiff called Albert B. Crawford, general superintendent of the Arizona Flour Mills, who testified that he supervised the unloading of the merchandise herein at the Tucson plant in May 1946; that the merchandise consisted of a grain called hegari; that he took a sample from car C B & Q 12513 (entry No. 4018) by taking a portion from 50 or 60 sacks out of the 803 sacks with a grain probe; that the sample weighed 4 or 6 pounds; that the merchandise so sampled was dirty, contained trash and cracked grains, was shrivelled, and looked as if it had been short of water or frostbitten; that in his opinion the shipment was of inferior grade. The witness gave similar

testimony with regard to the 769 sacks in car C & S 13808 (entry No. 4067). He also stated that after the merchandise was received it was ground, because—

\* \* \* it is customary in the feed business to grind the inferior quality of grain and put it into feeds, because nice, plump grains we sell as whole grain, but this being inferior quality, we reground it all.

Plaintiff then offered in evidence two cartons containing a portion of the official samples drawn by the customs officials in Nogales, and it was stipulated that each sample was drawn from only one sack in each entry. The cartons were received in evidence as plaintiff's exhibits 1 and 2.

Mr. Crawford testified that the taking of a sample from one sack out of 769 sacks would not constitute a fair sampling since the merchandise might come from different parts of the field, around the edges of fields, or different fields, and might be a different quality of grain; and that in shipping, the trash might shift to one side or the dirt to the bottom and that a sample from the middle of the sack is different from a sample taken at the ends of the bag. He was then asked how the merchandise in plaintiff's exhibit 1 compared with the sample he had taken and he stated that it was a better grade of grain because it did not have as much cracked grain and dirt in it. He gave similar testimony as to plaintiff's exhibit 2.

Plaintiff then called Albert Lent, manager of the Arizona Flour Mills, who testified that he had purchased the merchandise herein in Hermosillo, Mexico; that he examined it when it arrived in Tucson; that it contained a large amount of cracked, shrivelled, and immature grain, and considerable dirt and trash; that it was recleaned, ground, and mixed in cattle, poultry, and dairy feed. He was shown plaintiff's exhibits 1 and 2 and stated that they consisted of a superior type grain, containing larger, fuller grains and much less cracked and shrivelled grain and trash.

There were received into evidence as plaintiff's exhibits 3 and 4, affidavits executed by Albert Lent, stating that the merchandise had been ground, mixed with other feed ingredients, and sold for poultry or dairy feed. Those affidavits are attached to the official papers.

Mr. Lent further testified that neither he nor his company had been notified by the collector of customs that samples of seed had been drawn and that they should hold the shipment intact pending a decision of the Production and Marketing Administration.

He stated that he had imported three cars of hegari from Mexico all containing a like quality of hegari insofar as physical appearance and usage were concerned; that three separate samples had been taken from the three different cars; that the samples had not been consolidated; that one sample (from car C B & Q 12513) had been

sent to Dr. Robert L. Matlock at the University of Arizona; that the firm takes samples of each car of grain that it receives and that periodically the samples are ground up together; that that was what was done with the two other samples taken herein. (The third car and sample are not involved in this case.)

Robert L. Matlock, called for the plaintiff, stated that he is an agronomist and Professor of Agronomy with the College of Agriculture of the University of Arizona and secretary-treasurer of the Arizona Crop Improvement Association; that he has charge of all the research programs in field crops; that he was the main promoter of the seed improvement program and as a part of his duties his office handles the final certification of all planting seed under the program; that it is part of his duties to examine samples of hegari for purposes of certification; that in the certification program they are interested in the over-all quality of seed for planting purposes; that they check the germinability, viability, and purity of the samples as shown by foreign material, inert material, and their general quality as shown by cracked kernels and hulls.

Dr. Matlock testified that he recalled receiving a sample from Mr. Lent in May 1946; that it was dirty, full of dust, trash, and cracked grain, and contained many discolored, shrivelled, and immature seeds. He was shown plaintiff's exhibit 1 and stated that he would not consider it the same as the sample he had received; that—

* * * the external appearance is similar; the color of the seed is discolored, and there is a good deal of trash here, seed coats and things of that kind, but there is much less apparently cracked grain, and there is not as much small size seed and shrivelled seed here as there was in the sample I had.

Dr. Matlock testified that hegari is a variety of grain sorghum which came originally from South Africa; that it is adapted to dry climates; that the germinating qualities would be determined by its physical condition. He stated that the Arizona standard for certification of seeds is 85 per centum germination plus the general quality of the seed; and that the Federal Seed Act requires 75 per centum germination.

Dr. Matlock then stated that he had made no tests of germinability of the sample submitted by Mr. Lent; that the primary basis of his examination had been to determine whether or not it was hegari; that his examination had been purely visual; that in his opinion based on his work with hundreds of samples of seed the germinability of the sample would be well below the State of Arizona standard (85 per centum); that he would not hazard a guess as to whether or not it was below the 75 per centum Federal standard, but that the merchandise looked like samples of seed he had received that had been frost-damaged, which get a yellowish-green color and do not germinate. He stated that in order to actually determine the germinability of the

sample, tests taking about 10 days would have to be made. He testified further that the sample sent by Mr. Lent could not be designated as of seed quality in Arizona because it was not registered and that it would be absurd for any farmer to plant it when he could go out and buy certified seed.

Defendant introduced into evidence as defendant's exhibits 5 and 6, two laboratory reports signed by John W. Custer, Chief Chemist, U. S. Customs Laboratory, Los Angeles, Calif., both dated June 5, 1946, one referring to entry No. 4018 and the other to entry No. 4067. Defendant's exhibit 5 states:

Germination Test—$\dfrac{\text{Seven days}}{\text{Viability—84\%}}$

Defendant's exhibit 6 states:

Germination Test—$\dfrac{\text{Seven days}}{\text{Viability—82\%}}$

There was also received into evidence, as defendant's exhibit 7, a portion of a letter dated December 9, 1946, from W. D. Hay, Seed Technologist of the Production and Marketing Administration, Federal-State Seed Laboratory, of the United States Department of Agriculture, which gives the result of germination and purity tests on samples of the merchandise herein as follows:

| FSA No. | Entry No. | Car No. | | Pure seed | Germination | Pure live seed |
|---------|-----------|---------|---|-----------|-------------|----------------|
| * | * | * | * | * | * | * |
| C–275 | 4018 | C B & Q | 12513 | 99. 25 | 77 | 76. 42 |
| C–276 | 4067 | C & S | 13808 | 98. 36 | 78 | 76. 72 |

It was stipulated that this analysis was based upon an examination of about one-quarter of the merchandise contained in plaintiff's exhibits 1 and 2.

The first issue to be determined is whether or not the involved merchandise is a forage crop seed and thus dutiable under paragraph 763, as assessed by the collector. The fact that it was not used for seeding purposes is immaterial since it has been held that the proviso in paragraph 764 applies also to paragraph 763. *United States* v. *Albers Bros. Milling Co. and Geo. S. Bush & Co.*, 19 C. C. P. A. 88, T. D. 45226. Said proviso states:

*Provided*, That the provisions for seeds in this schedule shall include such seeds whether used for planting or for other purposes.

However, it has also been held that "Congress intended to levy duty under paragraph 763 of the Tariff Act of 1930 only on such 'other grass and forage crop seeds not specially provided for' as would meet the qualifications for seeds on importation and sale as established by the Federal Government." *Albers Bros. Milling Co.* v. *United States*, 2 Cust. Ct. 194, 195, C. D. 122; *Song Kee & Co.* v. *United States*, 7 Cust. Ct. 111, C. D. 548.

The Federal Seed Act prohibits the importation of any seed which is unfit for seeding purposes (7 U. S. C. sec 1581) and includes within the definition of such seed the following (sec. 1584 (c)):

(c) If any such seed contains less than 75 per centum of pure, live seed, or if any component of such seed present to the extent of 10 per centum or more contains less than 75 per centum of live seed: *Provided,* That when the Secretary of Agriculture shall find that any such seed or any kind of seed present to the extent of 10 per centum or more cannot be produced to contain 75 per centum of pure, live seed, he may set up such standard from time to time for pure, live seed as he finds can be produced.

Section 1582 (c) (2) provides that the provisions of the act do not apply—

(2) when the Secretary of Agriculture finds that a substantial proportion of the importations of any kind of seed is used for other than seeding purposes, and he provides by rules and regulations that seed of such kind not imported for seeding purposes shall be exempted from the provisions of the chapter: *Provided,* That importations of such kinds of seed shall be accompanied by a declaration setting forth the use for which imported when and as required under joint rules and regulations prescribed under section 1592 of this title.

Joint regulations have been issued by the Secretary of the Treasury and the Secretary of Agriculture for the enforcement of the Federal Seed Act. (Code of Federal Regulations, Cum. Supp., title 7, sec. 201.201–201.231.) Section 201.222 of these regulations provides that entries covering importations of certain seeds, including sorghum "shall contain a statement by the importer setting forth the use for which imported. When imported for seeding purposes such seed is subject to the import provisions of the Act." Plaintiff claims that this regulation was complied with by the filing of the affidavits of Albert Lent with the collector (plaintiff's exhibits 3 and 4). The entries themselves contain no statement as to the use for which the merchandise was imported, and the affidavits, which are dated several days after the entry dates, state that the merchandise—

* * * was upon arrival at the plant of the Arizona Flour Mills at Tucson, ground, mixed with other feed ingredients and sold for poultry or dairy feed.

Therefore, the regulation may not have been precisely complied with.

However, we do not think compliance or noncompliance with the regulation is determinative of the question here involved. We think that the merchandise is dutiable as "seed" under the tariff act if it is fit for use as "seed" under the Federal Seed Act; that is, if it contained 75 per centum or more of pure, live seed.

In the instant case the collector assessed duty on the merchandise under paragraph 763 as "seed"; therefore, it is presumed that he found all the facts necessary to bring it within that classification. *United States* v. *I. Magnin & Co., Inc.,* 21 C. C. P. A. 77, T. D. 46394; *United States* v. *Marshall Field & Co.,* 17 C. C. P. A. 1, T. D. 43309. However, his findings are based upon the tests and analyses of the official

samples made by John W. Custer, Chief Chemist, and W. D. Hay, Seed Technologist (defendant's exhibits 5, 6, and 7). The official samples were taken from but one sack in each entry, and, according to the witness Albert B. Crawford, did not constitute a fair sampling. Moreover, they were not taken in accordance with the regulations issued under the Federal Seed Act which require that every fifth bag be sampled (Code of Federal Regulations, Cum. Supp., title 7, sec. 201.212). The regulations also require the collector to notify the owner or consignee that samples have been drawn and that the shipment should be held intact pending a decision of the agricultural Marketing Administration (sec. 201.217). This was not done in the instant case.

Plaintiff's sampling appears to have been more representative than the Government's since some 50 or 60 bags out of 803 were sampled, although it did not meet the requirements of the regulations. No tests for germinability were made of plaintiff's samples. A portion of one sample was sent to Dr. Matlock, who testified from visual observation that it was under the 85 per centum Arizona standard for germinability; that he would not hazard a guess in regard to the 75 per centum Federal standard, but that the grain appeared to be frostbitten and that such grain does not germinate. Plaintiff's witnesses all testified that the merchandise contained in the Government's samples was of superior grade; that it did not include as much dirt, trash, and cracked and shrivelled grain as that contained in plaintiff's samples.

The official tests of samples of a superior portion of the merchandise show the percentage of pure, live seed to be little more than 75 per centum. It seems logical to suppose, therefore, that the bulk of the merchandise, which contained more shrivelled and cracked grain and appeared frostbitten, would have shown less than the required 75 per centum of pure, live seed. The exceptions provided in the Federal Seed Act and the regulations issued thereunder indicate that it was well-known that certain seeds, including sorghum, were imported for other than seeding purposes and were therefore not required to meet the standards set up by the act. While this would not preclude merchandise which met the germinability test from being dutiable as "seed" under the tariff act, it is an indication that such merchandise is rarely imported. Taking all of the circumstances of this case into account, we find that the merchandise herein was not "seed" within the meaning of paragraph 763 of the Tariff Act of 1930.

Plaintiff claims that the merchandise is either free of duty under paragraph 1722 as a crude vegetable substance, not specially provided for, or dutiable at 10 per centum ad valorem under paragraph 1558 as a nonenumerated unmanufactured article. In *Albers Bros. Milling Co.* v. *United States, supra*, it was held that kaoliang seed (a variety of grain

sorghum), 54 per.centum of which was shown to have germinating qualities, was dutiable at 10 per centum under paragraph 1558 as a nonenumerated unmanufactured article. A claim was made that the merchandise was free of duty under paragraph 1722 (see statement of facts in original hearing, 73 Treas. Dec. 153, T. D. 49374), but that claim was not discussed by the court.

In *United States* v. *Albers Bros. Milling Co. and Geo. S. Bush & Co.*, *supra*, it was held that millet seed which had lost its germinating qualities by kiln-drying was dutiable as a nonenumerated unmanufactured article. The court said (p. 90):

We do not believe the merchandise responds to the provision in the free list for "vegetable substances, crude." It seems to be the contention of appellees that since the millet seeds are no longer seeds for planting purposes and are vegetable in origin and nature, they are for this reason to be regarded as crude, although it is clear that prior to the kiln treatment they could not be so regarded for tariff purposes.

We can not agree that grains and seeds which have a dutiable status before treatment can be rendered crude and free of duty by a subsequent treatment such as is shown in connection with the merchandise at bar. * * *

In the instant case there is no evidence that the merchandise was treated in any way, but apparently lost its germinating qualities through some natural cause, such as frost.

In *Reed & Keller* v. *United States*, 5 Ct. Cust. Appls. 95, T. D. 34133, the court held that birch bark was not included within the term "vegetable substance," stating that while the term was broad enough to include all substances that are the product of the vegetable kingdom, it was introduced by the words "moss" and "seaweeds" which carried some indication of the class or kind of vegetable substance Congress intended to be included.

In *James P. Smith & Co.* v. *United States*, 21 C. C. P. A. 514, T. D. 46971, it was held that mustard dross consisting of the hull and bran left after the mustard had been made was not free of duty as a vegetable substance, following a long line of uniform holdings. The court mentioned, but did not consider controlling, the following cases in which the merchandise was held free of duty as a vegetable substance: *In re McNiven*, T. D. 16228, G. A. 3107 (oat chaff thrown off in the process of thrashing); *Haskell & Co.* v. *United States*, T. D. 15399, G. A. 2793 (oat-seed hulls in the form of refuse or chaff produced in removing the oat seed from the outer covering); *Goessling & Co.* v. *United States*, 4 Treas. Dec. 989, T. D. 23431, G. A. 5052 (pea hulls which had been subjected to a process of cutting).

In a later case, *F. F. G. Harper & Co.* v. *United States*, 39 Treas. Dec. 517, Abstract 44277, it was held that the tiny shoots that had sprouted from barley malt were free of duty as vegetable substances.

Since none of these cases involved *seeds*, they are not controlling herein, particularly in view of the following statement from the Summary of Tariff Information, 1929 (p. 1373):

*Kaffir corn, milo maize, and feterita seed* have been held by the Treasury Department to be dutiable under paragraph 761, if they have not lost their germinating qualities. If such seeds, it was held, have lost their germinating qualities, they are dutiable at 10 per cent as unenumerated unmanufactured articles, paragraph 1459, or if their germinating qualities were destroyed by some process they are dutiable at 20 per cent as unenumerated manufactured articles, paragraph 1459. (C. I. E. 1529.)

Such administrative practice followed by subsequent legislation (the Tariff Act of 1930) making no change in terms is a very persuasive, if not a controlling factor. *Washington Handle Co.* v. *United States*, 34 C. C. P. A. 80, 85, C. A. D. 346; *Bache & Co.* v. *United States*, 11 Ct. Cust. Appls. 314, T. D. 39129; *Joshua Hoyle & Sons, Ltd., Inc.* v. *United States*, 25 C. C. P. A. 128, T. D. 49244.

We hold, therefore, that the merchandise herein is properly dutiable at 10 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930, as a nonenumerated unmanufactured article. To that extent the protests are sustained and judgment will be rendered in favor of plaintiffs.